Nationwide's Complaint

EXHIBIT A

COPY

1  PAUL B. DERBY [SBN 211352]
   pderby@skiermontderby.com
2  HAJIR ARDEBILI [SBN 224624]
   hardebili@skiermontderby.com
3  SKIERMONT DERBY LLP
   800 Wilshire Boulevard, Suite 1450
4  Los Angeles, California 90017
   Telephone:    (213) 788-4500
5  Facsimile:    (213) 788-4545
6
7  Attorneys for Plaintiff
   NATIONWIDE HEALTH PROPERTIES, LLC
8

F I L E D
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

JUL 3 0 2018

V. Alvarado

9
10              SUPERIOR COURT OF THE STATE OF CALIFORNIA
11                    FOR THE COUNTY OF RIVERSIDE
12

13  NATIONWIDE HEALTH PROPERTIES, LLC,        Case No.  RIC  1815570
    a Delaware limited liability company,
14                                            COMPLAINT FOR:
15              Plaintiff,
                                              1.  DECLARATORY RELIEF;
16  v.                                        2.  BREACH OF CONTRACT;
                                              3.  INTENTIONAL INTERFERENCE
17  BANNING HEALTHCARE INVESTMENT,                WITH CONTRACT;
    LLC, a Washington limited liability company;  4.  INTENTIONAL INTERFERENCE
18  CAREAGE, INC., a Washington corporation;      WITH PROSPECTIVE ECONOMIC
    CAREAGE HEALTHCARE OF                         ADVANTAGE; AND
19  WASHINGTON, INC., a Washington            5.  NEGLIGENT INTERFERENCE WITH
    corporation; CAREAGE HOME HEALTH OF          PROSPECTIVE ECONOMIC
20  CALIFORNIA, LLC, a Washington limited        ADVANTAGE
    liability company; RCCI, LLC, a Washington
21  limited liability company; GENE LYNN, an
    individual; and DOES 1 through 20, inclusive,
22
23              Defendants,
24
    and
25
26  MLD BANNING INVESTMENT, LLC, a
    California limited liability company,
27
                Nominal Defendant.
28
29
30
31
32
33

COMPLAINT

## INTRODUCTION AND SUMMARY OF CLAIMS

1.    This action arises out of a scheme to wrongfully deprive Plaintiff Nationwide Health Properties, LLC of its rights under two loan agreements that Plaintiff's corporate predecessor, Nationwide Health Properties, Inc., entered into with Nominal Defendant MLD Banning Investment, LLC ("MLD"), pursuant to which it extended a total of nearly $18 million in loans to MLD that were used to finance an assisted living and memory care facility in Banning, California known as "The Lakes at Banning." The plot to deny Plaintiff the benefit of its bargain under those loan agreements was conceived by Defendant Gene Lynn—who originated the idea to develop the healthcare facility—and carried out by Lynn and his companies, Defendants Banning Healthcare Investment, LLC ("BHI"), Careage, Inc., Careage Healthcare of Washington, Inc., Careage Home Health of California, LLC, and RCCI, LLC. Defendant BHI is one of the two members of MLD, with the other member being non-party MLD Financial Capital Corporation ("FCC").

2.    Lynn not only benefitted from Plaintiff's complete financing of his healthcare project, but also profited by the funds being used to pay Lynn's Careage companies to perform the development and construction of the facility. Thus, the loan agreements between Plaintiff and MLD were structured to give Lynn and his companies tremendous upside at the beginning of the transaction, with Plaintiff receiving most of its benefit during the latter stages of the deal. The loan amounts were not dictated by Plaintiff, but instead gave MLD everything Lynn asked for based on Lynn's own projections of the venture's anticipated performance. In fact, Lynn was so confident in his plans that he and one of his Careage companies each personally guaranteed the venture's lease payments. Lynn's healthcare venture has not succeeded as he hoped, however, which has required him to contribute his own funds to keep it afloat. In an effort to alleviate the financial pressure on him personally, Lynn now seeks to renege on the agreements that he made with Plaintiff (and MLD), extort concessions from Plaintiff in the form of reduced interest rates on the loans that Plaintiff extended to MLD (including by way of directing his company BHI to file a derivative lawsuit purportedly on behalf of MLD), and cause MLD to deny Plaintiff its contractual right to participate in financing the development of certain property adjacent to the existing healthcare facility, all of which deprive Plaintiff of the benefits that it was entitled to receive in exchange for making the loans that were instrumental to getting Lynn's venture off the ground.

3.    The ultimate goal of Lynn's scheme is not to help MLD, but to benefit himself at the expense of both Plaintiff and MLD. If Lynn's campaign succeeds, then Plaintiff will lose millions of dollars that it otherwise would have earned through the MLD loans and potentially financing the development of the property adjacent to The Lakes. Accordingly, Plaintiff brings this action for

1  declaratory relief and compensatory damages to obtain an order that its existing loan agreements
2  with MLD shall remain in effect as originally negotiated, and seek redress for the economic injury
3  that it has already suffered as a result of Lynn and his companies' acts and omissions, which injuries
4  will only be exacerbated in the absence of the relief requested in this complaint.

5  **JURISDICTION AND VENUE**

6      4.      This Court has subject matter jurisdiction over this dispute because Plaintiff brings
7  claims under the statutory and common law of the State of California for acts occurring in this
8  jurisdiction.

9      5.      This Court has personal jurisdiction over Defendants because each of them regularly
10  conducts business in the State of California, and Defendants' bad acts complained of herein
11  occurred, and took effect in, this judicial district.

12      6.      Venue is proper in this Court pursuant to California Code of Civil Procedure section
13  395, *et seq.*, because the acts and omissions alleged in this Complaint took place, and Plaintiff
14  suffered damages, in the State of California, County of Riverside.

15  **THE PARTIES**

16      7.      Plaintiff Nationwide Health Properties, LLC is a Delaware limited liability company
17  authorized to do and doing business in California, with its principal place of business in Louisville,
18  Kentucky. Plaintiff's predecessor, Nationwide Health Properties, Inc., was incorporated in or about
19  October 1985 and operated under that name until approximately August 2011, when it became
20  Nationwide Health Properties, LLC. (Nationwide Health Properties, LLC, together with its
21  predecessor, Nationwide Health Properties, Inc., are collectively referred to herein as "Plaintiff" or
22  "NHP.") Plaintiff operates as a publicly traded real estate investment trust ("REIT") that invests in
23  senior housing facilities and long-term care facilities throughout the United States.

24      8.      Plaintiff is informed and believes, and on that basis alleges, that Nominal Defendant
25  MLD Banning Investment, LLC ("MLD") is, and at all relevant times was, a California limited
26  liability company, authorized to do and doing business in the State of California.

27      9.      Plaintiff is informed and believes, on that basis alleges, that Defendant Banning
28  Healthcare Investment, LLC ("BHI") is, and at all relevant times was, a Washington limited liability
29  company authorized to do and doing business in California, with its principal place of business in
30  Gig Harbor Washington. Plaintiff is informed and believes, and on that basis alleges, that since
31  2003, BHI has been a member of Nominal Defendant MLD. Plaintiff is further informed and
32  believes, and on that basis alleges, that BHI's sole member is Lynn or a Lynn-controlled trust.

33  ///

SKIERMONT DERBY LLP

Los Angeles

Dallas

10.     Plaintiff is informed and believes, and on that basis alleges, that Defendant Careage, Inc. is, and at all relevant times was, a Washington corporation authorized to do and doing business in California, with its principal place of business in Gig Harbor, Washington.  Plaintiff is further informed and believes, and on that basis alleges, that Lynn owns and/or controls Careage, Inc.

11.     Plaintiff is informed and believes, and on that basis alleges, that Defendant Careage Healthcare of Washington, Inc. ("Careage Healthcare") is, and at all relevant times was, a Washington corporation authorized to do and doing business in California, with its principal place of business in Gig Harbor, Washington.  Plaintiff is further informed and believes, and on that basis alleges, that Lynn owns and/or controls Careage Healthcare.

12.     Plaintiff is informed and believes, and on that basis alleges, that Defendant Careage Home Health of California, LLC ("Careage Home Health") is, and at all relevant times was, a Washington limited liability company authorized to do and doing business in California, with its principal place of business in Gig Harbor, Washington.  Plaintiff is further informed and believes, and on that basis alleges, that Lynn owns and/or controls Careage Home Health.  (Careage Inc., Careage Healthcare, and Careage Home Health are collectively referred to herein as "Careage.")

13.     Plaintiff is informed and believes, and on that basis alleges, that Defendant RCCI, LLC ("RCCI") is a Washington limited liability company doing business in California, with its principal place of business in Gig Harbor, Washington.  Plaintiff is further informed and believes, and on that basis alleges, that Lynn owns and/or controls RCCI.

14.     Plaintiff is informed and believes, and on that basis alleges, that Defendant Gene Lynn ("Lynn") is a resident of the State of Washington.  Plaintiff is further informed and believes, and on that basis alleges, that Lynn amassed significant wealth developing and operating assisted living and other healthcare facilities from the state of Washington to California.

15.     Plaintiff is ignorant of the true names and capacities of the defendants sued herein as Does 1 through 20, inclusive, and therefore sues these defendants by such fictitious names.  Plaintiff will amend this Complaint to allege their true names and capacities, when and if ascertained. Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously-named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages as herein alleged were proximately caused by those defendants.  (Collectively, Lynn, BHI, Careage, Inc., Careage Healthcare, Careage Home Health, RCCI and Does 1 through 20 (i.e., all defendants except for Nominal Defendant MLD) are hereinafter referred to as "Defendants.")

16.     Plaintiff is informed and believes, and on that basis alleges, that at all times material to this Complaint, each of the Defendants, whether expressly or fictitiously named, in addition to

1  acting for himself, herself, or itself and on his, her, or its own behalf individually, is and was acting
2  as the agent, servant, employee, partner, joint-venturer, or representative of, and with the knowledge,
3  consent, and permission of, and in conspiracy with, each and all of the Defendants and within the
4  course, scope, and authority of that agency, service, employment, partnership, joint venture,
5  representation, and conspiracy.  Plaintiff further alleges on information and belief that the acts of
6  each of the Defendants were fully ratified by each and all of the Defendants.  Specifically, and
7  without limitation, Plaintiff alleges on information and belief that the actions, failures to act,
8  breaches, conspiracy, and other misconduct alleged herein and attributed to one or more of the
9  specific Defendants were approved, ratified, and done with the cooperation and knowledge of each
10  and all of the Defendants.  Plaintiff further alleges on information and belief that each and all of the
11  Defendants were the alter egos of one another, joint tortfeasors, and successors in interest such that
12  each and all of the Defendants would be liable to Plaintiff.

### GENERAL ALLEGATIONS

**BHI and FCC Create MLD, a Joint Venture to Develop and Own An Assisted Living Facility, and Plaintiff Serves as MLD's Lender**

16  17.  Plaintiff is informed and believes, and on that basis alleges, that in the early 2000s,
17  Defendant Lynn wanted to develop an assisted living facility in Banning, California called "The
18  Lakes at Banning" ("The Lakes").  Lynn needed both a business partner and a lender to get The
19  Lakes off the ground.  Lynn sought out Plaintiff, which had worked with Lynn and his Careage
20  companies on other projects, to fulfill both roles.

21  18.  To facilitate the arrangement, the parties created MLD in 2003 as a joint venture
22  between Lynn (through BHI) and Plaintiff (through its subsidiary, FCC).

23  19.  Lynn, through BHI, pushed MLD, as the joint venture, to obtain loans from Plaintiff
24  to finance The Lakes.  In 2003, Plaintiff agreed to be the lender and provided 100% of the
25  development and acquisition costs of The Lakes by lending MLD $13.3 million.  To compensate
26  Plaintiff for the risk of investing 100% of the capital for the project, the loan is structured as interest
27  only for 30 years, with interest rates starting at 11% and adjusting upward over time.  A true and
28  correct copy of the 2003 Construction Loan Agreement between Plaintiff and MLD is attached
29  hereto as Exhibit A.

30  20.  In 2008, Lynn wanted to add a "memory care" unit to The Lakes.  To cover the costs
31  of developing and constructing that addition, Plaintiff provided MLD a second loan.  This second
32  loan, for $4.3 million, largely matched the terms of the first loan and had a starting interest rate of
33  8.2%, which adjusts upward over time.  A true and correct copy of the 2008 Construction Loan

1  Agreement between Plaintiff and MLD is attached hereto as Exhibit B.  (The 2003 Construction
2  Loan Agreement and the 2008 Construction Loan Agreement are collectively referred to herein as
3  the "Loan Agreements.")

4      21.    Not only did Lynn receive the benefit of having The Lakes financed 100 percent by
5  Plaintiff, but he also used the funds from both of the Loan Agreements to pay his own Careage
6  companies to perform the development and construction of the facility.  Thus, based on the way the
7  parties' agreements were structured, Lynn and his companies enjoyed a significant profit at the start
8  of the deal.

9      22.    An Amended and Restated Operating Agreement (the "Operating Agreement"), a true
10 and correct copy of which is attached hereto as Exhibit C, governs the administration of MLD and
11 the rights and obligations of its members.  The express terms of the Operating Agreement are
12 designed to preserve the structure of the parties' relationships and protect the parties' expectations,
13 including maintaining the lending relationship with Plaintiff.

14     23.    To operate The Lakes, MLD entered into a lease agreement with non-party BHO,
15 LLC ("BHO"), as the tenant; that Lynn owns BHO (99% personally, and 1% through one of his
16 Careage companies); and that as part of the overall deal structure, the monthly rent payments from
17 BHO to MLD mirror the monthly interest payments that MLD pays to Plaintiff for the loans.
18 Plaintiff is further informed and believes that MLD has never made a profit throughout the entire
19 lease term, but instead has always functioned—as Lynn (through BHI) structured it—as a pass-
20 through for Lynn and his companies to pay Plaintiff for the loans.

21     24.    Lynn and one of his Careage entities personally guaranteed BHO's lease payments,
22 which causes Lynn to cover any shortfall if BHO is unable or unwilling to pay the rent to MLD.

23     **Lynn Seeks to Renege on the Loan Agreements to Benefit Himself and His Companies in**
24     **Violation of MLD's Operating Agreement and the Loan Agreements**

25     25.    Plaintiff is informed and believes, and on that basis alleges, that from the inception of
26 the deal, BHO has not generated sufficient revenue to make the rent payments to MLD and,
27 therefore, Lynn has been required to cover the shortfall under his personal guaranty and the Careage
28 guaranty, in the approximate amount of $600,000 per year.

29     26.    As a result of BHO's struggles, after Lynn convinced Plaintiff to make the second
30 loan, Lynn repeatedly demanded a complete restructuring of the original deal.  As part of the
31 restructuring, Lynn proposed that MLD refinance the loans at lower rates.  But the proposal to
32 refinance the loans was never motivated by a plan to improve the financial well-being of MLD.
33 Instead, the refinancing of the loans was only the first step in transferring money to Lynn and his

SKIERMONT DERBY
LLP
Los Angeles
Dallas

1  struggling tenant entity, BHO.  Thus, the proposal to refinance the loans has always been intended to
2  solely benefit Lynn and his BHO entity.  In short, once Lynn extracted all of the upside due to him
3  under the Loan Agreements and it came time for Plaintiff to enjoy its benefits of the bargain, Lynn
4  sought to back out of the deal.  Had Lynn succeeded in his venture, he would never have demanded
5  a restructuring of the deal.

6        27.  But the parties' deal was specifically structured to preclude Lynn from succeeding in
7  his campaign to refinance or renege on the Loan Agreements.  Pursuant to the Operating Agreement,
8  the deal structure is expressly set up to preserve and maintain the parties' existing relationships and
9  agreements, including Plaintiff's role as the lender.  Indeed, Section 4.1 of the Operating Agreement
10  specifically acknowledges that MLD "previously financed the Company's activities through a loan
11  from [Plaintiff]," references the 2003 Construction Loan Agreement and goes on to state that MLD
12  "intend[s] to further finance the Company's activities through [the 2008 Construction Loan
13  Agreement]."  Section 5.1 of the Operating Agreement states that "the Members have and intend to
14  continue to finance the Company's activities primarily through the NHP Loan," an acknowledgment
15  that is reiterated in Section 5.2 ("The Members have and intend to continue to finance the operations
16  of the Company by utilizing … the NHP Loan ….").

17        28.  The Operating Agreement also forecloses any effort to renegotiate the interest rates
18  set forth in the Loan Agreements.  By way of example, Section 5.7 of the Operating Agreement
19  expressly excludes the NHP loan from the requirement that loans from members to the joint venture
20  "bear interest as such rates as may be reasonably approved by the Members" and "be on terms
21  comparable to those which would be imposed by unrelated lending institutions for comparable loans
22  for the same purpose and in the same locality as the securing assets."

23        29.  In addition, Plaintiff and MLD entered into several assignment agreements to secure
24  the loans that lock in Plaintiff's role as lender and preclude any refinancing.  More specifically,
25  MLD assigned, among other things, its rents and any other benefits derived from leases of the
26  property; its security interest in BHO's personal property on the land where the facility is located;
27  the agreements, plans, and specifications for the healthcare project; and all authorizations, approvals,
28  permits, variances, land use entitlements, licenses, franchises, and agreements for the use,
29  occupancy, or operation of the land or improvements.

30  **BHI Files Suit Against MLD and Other Defendants, Without Joining Plaintiff as a Party**

31        30.  Notwithstanding the clear terms of the Loan Agreements, assignment agreements, and
32  Operating Agreement, BHI nevertheless continues its efforts to renege on its agreements.  BHI
33  contends that it undertook an independent investigation concerning market loan rates for loans

SKIERMONT DERBY LLP  Los Angeles  Dallas

1   similar to those between MLD and NHP during the period between approximately 2011 and 2015, as
2   well as whether MLD's loans could potentially be refinanced through a third party at a rate and on
3   terms that would be more advantageous to MLD.  BHI further contends that its investigation
4   revealed that from approximately July 2011 through the present, the loans from NHP to MLD,
5   totaling approximately $18 million, could have been refinanced at a lower interest rate.

6        31.    Based on the foregoing contentions, BHI maintains that FCC, the managing member
7   of MLD, was under an obligation to refinance the loans with Plaintiff.  Even if FCC had such an
8   obligation (which obligation FCC denies), the value of The Lakes between 2011 and 2015 was far
9   below MLD's $17.7 million in outstanding debt and, accordingly, refinancing the loans in the
10   marketplace as Lynn and BHI requested was impossible and would remain that way without a
11   significant improvement in BHO's performance.  Moreover, the assignment agreements between
12   MLD and Plaintiff leave MLD without any collateral to offer as security, which also renders any
13   refinancing a non-starter.

14        32.    Rather than making the necessary investment in improving BHO's operations, Lynn
15   chose to litigate.  On or about December 19, 2016, BHI filed a complaint against MLD, FCC, and
16   Ventas, Inc., an indirect parent company to FCC and Plaintiff, asserting causes of action for breach
17   of fiduciary duties, breach of contract, and a declaration of removal of FCC as the managing member
18   of MLD, as well as a purported cause of action for alter ego liability (the "BHI Lawsuit").  BHI
19   styled its action as a derivative lawsuit purportedly on behalf of MLD, even though it is plainly
20   apparent that the BHI Lawsuit is motivated by Lynn's personal gain.  Although the claims asserted
21   in the BHI Lawsuit are inextricably intertwined, both legally and factually, with the loans that
22   Plaintiff extended to MLD—and thus Plaintiff would appear to be an indispensable party to the BHI
23   Lawsuit—BHI inexplicably did not include Plaintiff as a party to that action.

24   **MLD and Plaintiff Have Exclusive First Rights to Develop and Finance the Adjacent Property**

25        33.    Since the time that BHI and FCC created MLD, a Lynn-controlled entity (whether
26   BHI or its affiliate) has owned certain property adjacent to The Lakes (the "Adjacent Property").
27   Any development of the Adjacent Property in which MLD participates has the ability to generate
28   business synergies and opportunities that would benefit not only the development on the Adjacent
29   Property but also the value and current property of MLD.  Conversely, any development on the
30   Adjacent Property that does not support the operations of The Lakes would negatively impact The
31   Lakes and MLD.

32        34.    Recognizing the impact any development on the Adjacent Property would have on
33   MLD, BHI agreed, in the MLD Operating Agreement, to give MLD "the exclusive first right to

COMPLAINT

SKIERMONT DERBY LLP   Los Angeles   Dallas

1  participate with BHI or such Affiliate in the development of the Adjacent Property." BHI was to
2  provide information regarding any potential development to MLD, through its managing member, to
3  allow MLD to exercise that right.

4       35.    In particular, Section 7.6 of the Operating Agreement sets forth BHI's duties with
5  respect to the Adjacent Property. Section 7.6 states, in relevant part:

6         [I]n the event that BHI or its Affiliate elects to develop the adjacent
7         property owned by RCCI, LLC (the "Adjacent Property"), MLD will
8         have the exclusive first right to participate with BHI or such Affiliate
9         in the development of the Adjacent Property. BHI or its Affiliate shall
10        deliver a written proposal to MLD setting forth the proposed
11        development plan, anticipated development and construction costs,
12        project timelines and operating projections. If MLD should decline to
13        participate in the additional development on the Adjacent Property or
14        fail to affirmatively respond to the written proposal within one
15        hundred twenty (120) days of its receipt thereof, and provided that the
16        project is developed for a Permitted Use (as defined in the Loan
17        Agreement) or another use that does not compete with an independent
18        living facility, assisted living facility or a dementia care facility, then
19        BHI or such Affiliate shall have the right to freely proceed with the
20        development of the Adjacent Property without the participation of
21        MLD.

22      36.    Also, Section 14 of the Operating Agreement describes certain indemnification
23 obligations between MLD's members. Section 14.1 states:

24        Each Member hereby agrees to indemnify, defend and hold harmless
25        the other Member and [MLD Banning] (and their respective direct and
26        indirect agents, . . . representatives, offices, directors, shareholders or
27        partners) from and against all claims, losses, damages, costs, expenses,
28        liabilities, obligations . . . and reasonable attorneys' fees ("Claims")
29        which may arise as a result of any of the following on the part of such
30        indemnifying Member, its employees or other representatives: . . . any
31        act or omission that . . . constitutes negligence or willful misconduct
32        on the part of the indemnifying Member.

33 ///

SKIERMONT DERBY LLP
Los Angeles
Dallas

COMPLAINT

37.     Further, as partial consideration to Plaintiff in exchange for the loans that Plaintiff extended to MLD, Plaintiff was provided a contractual right to participate in financing any development of the Adjacent Property.  Specifically, in Section 7.6 of the 2003 Construction Loan Agreement, MLD covenanted as follows:

> In the event that Careage or its Affiliate elects to develop the Adjacent Property, Lender will have the exclusive first right to finance the additional development on the Adjacent Property at Lender's then current terms for such projects. Lender will entertain a proposal from Careage or such Affiliate to acquire the Adjacent Property and amend the Facility Lease or to finance the additional development once the development concept and budgets are completed and presented to Lender for its review and approval. Careage or its Affiliate shall deliver a written proposal to Lender setting forth the proposed development plan, anticipated development and construction costs, project timelines and operating projections. If Lender should decline to finance the additional development on the Adjacent Property or fail to affirmatively respond to the written proposal within one hundred twenty (120) days of its receipt thereof, and provided that the project is developed for a Permitted Use or another use that does not compete with an independent living facility or an assisted living facility, then Careage or such Affiliate shall have the right to finance the same development concept and budget with another source of capital.

38.     Similarly, as partial consideration for Plaintiff providing the 2008 loan, Section 7.6 of the 2008 Construction Loan Agreement provided Plaintiff the contractual right to finance the development of the Adjacent Property:

> In the event that Careage or its Affiliate elects to develop the Adjacent Property, Lender will have the exclusive first right to finance the additional development on the Adjacent Property at Lender's then current terms for such projects. Lender will entertain a proposal from Careage or such Affiliate to acquire the Adjacent Property and amend the Facility Lease or to finance the additional development once the development concept and budgets are completed and presented to Lender for its review and approval. Careage or its Affiliate shall deliver a written proposal to Lender setting forth the proposed

9

COMPLAINT

1    development plan, anticipated development and construction costs,
2    project timelines and operating projections. If Lender should decline to
3    finance the additional development on the Adjacent Property or fail to
4    affirmatively respond to the written proposal within one hundred
5    twenty (120) days of its receipt thereof, and provided that the project is
6    developed for a Permitted Use or another use that does not compete
7    with a dementia care facility, then Careage or such Affiliate shall have
8    the right to finance the same development concept and budget with
9    another source of capital.

10   39.    In addition, Section 9.1 of the Loan Agreements makes clear that any breach of

11   Section 7.6 above is an Event of Default under those agreements.  Specifically, Section 9.1(a)(iii)

12   defines an Event of Default to include a "material default by Borrower or any of its members or

13   Careage (or any Affiliate of any of them other than MLD) under any other obligation owed by

14   Borrower or any of its members or Careage (or any such Affiliate) to Lender or any Affiliate of

15   Lender, including, without limitation, the Existing Loan Agreement, which default is not cured

16   within any applicable cure period provided in the documentation for such obligation."  Further,

17   Section 9.1(b) clarifies that a breach of Section 7.6 is a material default for which there is no cure

18   period: "There shall be no cure period in the event of the breach by Borrower of . . . the provisions of

19   Section 7.6."

20   **BHI Violates MLD and Plaintiff's Exclusive First Rights Regarding the Adjacent Property**

21   40.    The Adjacent Property came to be owned by Defendant RCCI.  Like BHI, RCCI is a

22   Washington limited liability company that is wholly owned by Lynn and/or a Lynn-associated trust.

23   RCCI is a corporate affiliate of Careage and BHI.

24   41.    Plaintiff is informed and believes, and on that basis alleges, that, in late 2016 or early

25   2017, BHI and its affiliates began discussing a potential development of the Adjacent Property with

26   non-party EPIC Management, L.P. ("EPIC"), with EPIC expressing interest in developing a medical

27   office building on the Adjacent Property.

28   42.    Plaintiff is informed and believes, and on that basis alleges, that before and while

29   negotiating a development plan for the Adjacent Property with EPIC, BHI did not inform MLD,

30   through FCC or otherwise, about the plan or any opportunity to develop the Adjacent Property.

31   43.    Upon information and belief, BHI and its affiliates continued to negotiate and create a

32   plan for the development of the Adjacent Property with EPIC.  As part of those negotiations and

33

SKIERMONT DERBY LLP
Los Angeles
Dallas

10
COMPLAINT

1   plans, BHI's affiliate, RCCI, agreed to a Purchase and Sale Agreement with EPIC whereby RCCI

2   would sell the Adjacent Property to EPIC pursuant to the negotiated development plan.

3        44.    Plaintiff is informed and believes, and on that basis alleges, that BHI never provided

4   MLD, through FCC or otherwise, a copy of the Purchase and Sale Agreement between RCCI and

5   EPIC, or any written proposal for MLD to participate in the development of the Adjacent Property.

6        45.    Because BHI did not provide information to MLD to allow it to exercise its exclusive

7   first right to develop the Adjacent Property, MLD was unable to provide any such information to

8   Plaintiff to allow Plaintiff to potentially finance such a development per the terms of the Loan

9   Agreements.

10       46.    Neither BHI nor any of its affiliates separately provided any information to Plaintiff

11  regarding an exclusive first opportunity to finance the development of the Adjacent Property.

12       47.    BHI and its affiliates (Careage, RCCI, and Lynn) also interfered with MLD's

13  contractual obligation to Plaintiff to allow Plaintiff to finance the development of the Adjacent

14  Property, causing Plaintiff to lose that opportunity.

15       48.    Due to Defendants' actions, Plaintiff has lost the potential benefits of its exclusive

16  right to participate in the financing of the Adjacent Property.  Moreover, in the event that the

17  declaratory relief Plaintiff requests herein is not granted, Plaintiff risks losing the benefit of its

18  bargain pursuant to the Loan Agreements, including but not limited to interest payments to which it

19  is entitled under those Agreement.

20                    **FIRST CAUSE OF ACTION**

21              **(Declaratory Relief – Against Defendant BHI and**

22                   **Nominal Defendant MLD)**

23       49.    Plaintiff restates and incorporates as though fully set forth here each of the allegations

24  contained in paragraphs 1 through 48.

25       50.    For the reasons alleged herein, a present, urgent, real, and actionable controversy

26  within the meaning of California Code of Civil Procedure section 1060 now exists between Plaintiff,

27  on the one hand, and Defendant BHI and Nominal Defendant MLD, on the other hand.

28       51.    Plaintiff therefore requests a full and final judicial determination of its rights and

29  responsibilities with regard to the Loan Agreements, including as to BHI and MLD.

30       52.    Plaintiff hereby requests a judicial determination and order establishing the following:

31              a.   Plaintiff is entitled to remain in place as MLD's lender in accordance with the

32                   Loan Agreements.

33  ///

SKIERMONT DERBY
LLP
Los Angeles
Dallas

b. The existing interest rates set forth in the Loan Agreements shall remain in effect, according to the terms of those agreements.

c. The Nominal Defendant MLD is not permitted to replace the NHP loans, according to the terms of those agreements.

d. BHI, Careage, RCCI, and/or Lynn's development of the Adjacent Property without giving Plaintiff the exclusive first right to participate was a material breach and Event of Default under the Loan Agreements and, accordingly, Plaintiff is entitled to revoke the license it provided to MLD to collect BHO's rent payments to MLD, and instead collect rent directly from BHO.

53. Plaintiff respectfully requests that an order providing the relief described in paragraph 52 issue forthwith.

### SECOND CAUSE OF ACTION

**(Breach of Contract – Against Nominal Defendant MLD)**

54. Plaintiff restates and incorporates as though fully set forth here each of the allegations contained in paragraphs 1 through 48.

55. Plaintiff and MLD entered into two written, legal, and enforceable contracts, i.e., the Loan Agreements.

56. Plaintiff performed all, or substantially all, of its obligations under the Loan Agreements, except to the extent that Plaintiff's performance was excused, waived, or made impossible by MLD's conduct, and Plaintiff is no manner in breach of any of the agreements.

57. As a result of BHI and its affiliates' failure and refusal to provide MLD with the opportunity to exercise its exclusive first right to develop the Adjacent Property as set forth in Section 7.6 of the Operating Agreement, MLD, in turn, breached the Loan Agreements by failing to provide Plaintiff with the opportunity to exercise its exclusive first right to finance the Adjacent Property as set forth in Section 7.6 of the Loan Agreements.

58. As a direct and proximate result of MLD's breach of the Loan Agreements, Plaintiff has sustained damages and will continue to sustain damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

**(Intentional Interference with Contract – Against Defendants BHI, Careage, Inc., Careage Healthcare, Careage Home Health, RCCI, and Lynn)**

59. Plaintiff restates and incorporates as though fully set forth here each of the allegations contained in paragraphs 1 through 48.

///

60.     Plaintiff is in a contractual relationship with MLD, by way of the Loan Agreements.

61.     At all times relevant herein, Defendants were aware of the contractual relationship between Plaintiff and MLD.

62.     Defendants acted to disrupt the contractual relationship between Plaintiff and MLD. Plaintiff is informed and believes, and on that basis alleges, that before and while negotiating a development plan for the Adjacent Property with EPIC, Defendants did not inform MLD about the plan or any opportunity to develop the Adjacent Property, and did not provide MLD a copy of the Purchase and Sale Agreement between RCCI and EPIC, or any written proposal for MLD to participate in the development of the Adjacent Property. Thus, MLD was unable to provide any such information to Plaintiff to allow Plaintiff to potentially finance such a development per the terms of the Loan Agreements. Moreover, Defendants did not separately provide any information to Plaintiff regarding an exclusive first opportunity to finance the development of the Adjacent Property.

63.     Defendants intended to disrupt the performance of the contracts between Plaintiff and MLD, or at least knew that disruption of performance was certain or substantially certain to occur.

64.     Defendants' actions caused actual disruption of Plaintiff's contractual relationship with MLD. Specifically, as a result of Defendants' interference, Plaintiff lost its opportunity to participate in financing the development of the Adjacent Property.

65.     As a proximate result of Defendants' intentional interference with the contractual relationship between Plaintiff and MLD, Plaintiff has suffered damages in an amount to be proven at trial.

66.     Defendants' acts were committed with malice, oppression, and fraud in that their conduct disrupting the performance of Plaintiff's contracts with MLD was despicable and done with a willful and knowing disregard of Plaintiff's rights. Accordingly, Plaintiff seeks an award of punitive damages.

## FOURTH CAUSE OF ACTION

**(Intentional Interference with Prospective Economic Advantage – Against Defendants BHI, Careage, Inc., Careage Healthcare, Careage Home Health, RCCI, and Lynn)**

67.     Plaintiff restates and incorporates as though fully set forth here each of the allegations contained in paragraphs 1 through 48.

68.     Plaintiff was in an economic relationship with MLD that probably would have resulted in an economic benefit to Plaintiff, i.e., the opportunity to participate in financing the development of the Adjacent Property.

69.     At all times relevant herein, Defendants were aware of the economic relationship between Plaintiff and MLD.

70.     Defendants engaged in wrongful conduct to disrupt the economic relationship between Plaintiff and MLD.  Plaintiff is informed and believes, and on that basis alleges, that Defendants acted to conceal their development plan for the Adjacent Property in an effort to deny Plaintiff and MLD their rights to participate in the development and financing of the Adjacent Property.  Defendants did not inform MLD about the plan or any opportunity to develop the Adjacent Property, and did not provide MLD a copy of the Purchase and Sale Agreement between RCCI and EPIC, or any written proposal for MLD to participate in the development of the Adjacent Property.  Thus, MLD was unable to provide any such information to Plaintiff to allow Plaintiff to potentially finance such a development per the terms of the Loan Agreements.  Moreover, Defendants concealed information from Plaintiff regarding its exclusive first opportunity to finance the development of the Adjacent Property.

71.     By engaging in the foregoing wrongful conduct, Defendants intended to disrupt the economic relationship between Plaintiff and MLD, or at least knew that disruption of that economic relationship was certain or substantially certain to occur.

72.     Defendants' actions caused actual disruption of Plaintiff's economic relationship with MLD.  Specifically, as a result of Defendants' interference, Plaintiff lost its opportunity to participate in financing the development of the Adjacent Property.

73.     As a proximate result of Defendants' intentional interference with the economic relationship between Plaintiff and MLD, Plaintiff has suffered damages in an amount to be proven at trial.

74.     Defendants' acts were committed with malice, oppression, and fraud in that their conduct disrupting the economic relationship between Plaintiff and MLD was despicable and done with a willful and knowing disregard of Plaintiff's rights.  Accordingly, Plaintiff seeks an award of punitive damages.

## FIFTH CAUSE OF ACTION

**(Negligent Interference with Prospective Economic Advantage – Against Defendants BHI, Careage, Inc., Careage Healthcare, Careage Home Health, RCCI, and Lynn)**

75.     Plaintiff restates and incorporates as though fully set forth here each of the allegations contained in paragraphs 1 through 48.

///

///

14

76.     Plaintiff was in an economic relationship with MLD that probably would have resulted in an economic benefit to Plaintiff, i.e., the opportunity to participate in financing the development of the Adjacent Property.

77.     At all times relevant herein, Defendants knew or should have known of the economic relationship between Plaintiff and MLD, and that the economic relationship between Plaintiff and MLD would be disrupted if Defendants failed to act with reasonable care.

78.     Defendants failed to act with reasonable care.  Instead, Defendants engaged in wrongful conduct to disrupt the economic relationship between Plaintiff and MLD.  Plaintiff is informed and believes, and on that basis alleges, that Defendants concealed their development plan for the Adjacent Property in an effort to deny Plaintiff and MLD their rights to participate in the development and financing of the Adjacent Property.  Defendants did not inform MLD about the plan or any opportunity to develop the Adjacent Property, and did not provide MLD a copy of the Purchase and Sale Agreement between RCCI and EPIC, or any written proposal for MLD to participate in the development of the Adjacent Property.  Thus, MLD was unable to provide any such information to Plaintiff to allow Plaintiff to potentially finance such a development per the terms of the Loan Agreements.  Moreover, Defendants concealed information from Plaintiff regarding its exclusive first opportunity to finance the development of the Adjacent Property.

79.     Defendants' actions caused actual disruption of Plaintiff's economic relationship with MLD.  Specifically, as a result of Defendants' interference, Plaintiff lost its opportunity to participate in financing the development of the Adjacent Property.

80.     As a proximate result of Defendants' negligent interference with the economic relationship between Plaintiff and MLD, Plaintiff has suffered damages in an amount to be proven at trial.

///
///
///
///
///
///
///
///
///
///

15
COMPLAINT

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.    For judgment in favor of Plaintiff and against Defendants;

2.    For an award of compensatory damages according to proof;

3.    For an award of punitive damages according to proof;

4.    For a declaration setting forth each of the rights, responsibilities, and obligations of the parties as more specifically described in paragraph 52;

5.    For an award of prejudgment interest to the extent permitted by law;

6.    For an award of Plaintiffs' reasonable attorneys' fees, to the extent permitted by law;

7.    For an award of costs of suit incurred herein; and

8.    For such other and further relief as the Court deems just and proper.

DATED: July 30, 2018                     SKIERMONT DERBY LLP

By: _____
    PAUL B. DERBY
    HAJIR ARDEBILI

    Attorneys for Plaintiff
    NATIONWIDE HEALTH PROPERTIES, LLC